Rash's Estate

Before Lamorelle, P. J., and Gest, Henderson, Van Dusen and Sinkler, JJ.
The facts appear from the opinion of

HENDERSON, presiding judge.—This is an appeal from the decree of the regis-. ter admitting to probate a paper writing dated April 28, 1933, alleged to be the last will of Mary Rash, who died June 18, 1933.

The decedent left to survive her two daughters, Sophia Rash Noble, the appellant, Dorothy Rash Fineberg, and a son, Joseph H. Rash.

The petition alleged: (1) That at the time of the execution of the alleged will the decedent was not of sound and disposing mind, memory and understanding; and (2) that the alleged will was procured by undue influence exerted upon the decedent by Joseph H. Rash and others.

The appellant was called, but she was unable to point to anything to justify her allegation of undue influence by Joseph H. Rash or anyone else; and she offered no other testimony in support of this allegation.

While no such testimony was offered, it should be pointed out that a child may properly exercise more influence with a parent than a stranger: Dean et ux. v. Negley et al., 41 Pa. 312, 317.

It should also be noted that opportunity does not constitute undue influence: Buechley's Estate, 278 Pa. 227; Koons' Estate, 293 Pa. 465.

This court has on other occasions condemned the practice of litigants of alleg-

ing in sworn petitions that of which there is no prima facie basis of fact: Llewellyn's Estate, 10 D. & C. 313, 314, affirmed in 296 Pa. 74.

The burden is upon the appellant to disprove testamentary capacity. The will was prepared by a member of our bar of unimpeached standing, Bernard A. Illoway, from instructions given to him personally by the decedent, and his testimony creates a strong prima facie case in favor of the will: Brennan's Estate, 312 Pa. 335. In that case Mr. Justice Kephart said (p. 341) : "The inference is, when a will has been prepared by counsel without the interference of any person, that the will was properly made by a person of testamentary capacity. This inference can only be overcome by clear, definite and weighty evidence of facts irreconcilable with the possession of testamentary capacity. Morgan's Estate, 219 Pa. 355." See also Aggas v. Munnell et al., 302 Pa. 78.

The appellant's three principal witnesses, in support of her contention that the decedent lacked testamentary capacity, were Doctor Edeiken, her physician, who saw her frequently, both before and after the execution of the will; Doctor Yaskin, who saw her only on February 2, March 2, and June 3 and 9, 1933; and Doctor Rubenstone, who saw her only on May 11, 1933. It will be recalled that the will is dated April 28, 1933.

Dr. Joseph Edeiken was decedent's physician. He graduated from the University of Pennsylvania in 1925. He spent a year as an interne and 2 years as chief resident of Mt. Sinai Hospital; then he studied abroad for a year and has been practicing since 1929.

He testified that Mrs. Rash had a carcinoma of the breast, removed about 7 or 8 years ago, "following which there was a metastasis to the bones of the pelvis, of the chest, and of the head."

He explained that by metastasis was understood a spreading of the original tumor to the various portions of the body, especially the bones of the pelvis, the chest and the head.

He said these symptoms continued to spread until shortly before her death when bronchial pneumonia developed from which she passed away.

He further said that at one time it was thought that she had carcinoma of the skull and because of this a decompression operation was performed by Doctor Frazier at the University Hospital.

The symptoms which led Doctor Edeiken to his medical conclusions were severe headaches, bulging of the left eye, deviation of the tongue to one side, paralysis of one vocal cord with inability to swallow and almost inability to talk, double vision, and loss of hearing. By a process of elimination, Doctor Edeiken diagnosed the disease as a metastasis either to the bones of the skull or to the brain. He said an examination did not disclose any metastatic tumor on the vocal cord.

His professional opinion in regard to the decedent's mental capacity was based on her suspicions of those around her and especially of himself—Doctor Edeiken—and on her irrationality.

He testified at length as to her suspicions of himself and said that she was checking up on him. He was asked:

"Q. How did that suspicion manifest itself? A. For example, I would go to see Mrs. Rash and she was very much depressed. Q. Fix the date or the approximate date. A. Well, this was, I should say from the beginning of April; she would say I am not telling the truth—I was not. Q. That you were not telling the truth? A. As a matter of fact, I was not, because I did not want her to know she had carcinoma. Q. What did she follow that remark with? A. She said, 'Why don't you get another doctor in with you, maybe perhaps you are making an error or mistake.' I said, 'No. I am quite sure I am correct.' Q. About

her diagnosis? A. Yes (continuing), 'I am quite sure I am correct because I have these X-ray plates and you were studied at Mt. Sinai Hospital and the University Hospital.' And she said, 'Yes, but two heads are better than one.' I put her off as far as consultants were concerned because I did not feel she should waste her money on consultants, because they could not do anything for her. Q. What did you tell her she was suffering from? A. Neuralgia. Q. And that is what she doubted apparently? A. Yes, at one time she would doubt the diagnosis, and the next•time she would doubt as to whether she was receiving the proper treatment. Q. Those were the two manners in which she manifested her suspicions of you? A. Yes."

Such testimony can hardly be made the basis of a finding that she was inordinately suspicious. Mrs. Rash had undoubtedly been kept in the dark for some time and the fact that she had cancer concealed from her. She, however, was conscious that she had not been fully advised, and she was fearful that something more serious was the matter with her than neuralgia.

What suspicions Mrs. Rash had were well founded, and the doctor portrays an acute mentality in that she realized that she was not being told the truth and that a deception was being practiced upon her. I cannot say that there is evidence that she was suspicious without cause.

Doctor Edeiken testified that she was irrational and "talked of things of which she knew nothing and the next minute she forgot that she said those things . . . she did not have any sort of memory. I would speak to her at one time and the next time she had forgotten what I said. . . . She was having all sorts of dreams; every night she would tell me that during the daytime she saw her husband come into her room and sit down and they had a large easy chair and he would sit down in this large easy chair and on one occasion she even got up out of bed to get to her husband, . . . ."

While Doctor Edeiken thus portrayed his patient, he was compelled to admit that she was actively engaged in business, was the president of a manufacturing concern, visited her office at Twelfth and Cherry Streets daily, frequently against the doctor's orders, signed checks, dealt with business people, visited Atlantic City with the doctor, staying there for several days with her companion, Miss Petry, who afterwards became her nurse, visited Doctor Edeiken's brother twice a week, dressed herself, and conducted herself in a normal fashion up to the time she was taken to bed permanently, early in May 1933.

In answer to a question as to whether or not Mrs. Rash had a mind and memory sufficiently sound to enable her to know and understand the making of a will, he testified:

"No, I would say she was not in proper mental condition, not only because of her condition, but because of the huge amount of drugs she was getting at that time, namely, all sorts of sedatives, narcotics, and all sorts of medication."

And again he testified:

"Q. In addition to her mental condition, what was the quantity of drugs she was getting, if you can tell us, narcotics? A. Well, Mrs. Rash would take anywheres from—at the beginning, that is, in the early part of January up until April, she was taking as much as 3 and 4 grains of luminol at night, about 3 grains of sodiumamytal; in addition to that she frequently got morphine in the form of pantopon and quite a large amount of codein."

Doctor Edeiken further testified that he had very very often seen Mrs. Rash in a dopey condition.

Doctor Edeiken did not refer in his testimony to the prescriptions he had written. They had been compounded by Doctor Harris and as to their effect on a patient Doctor Ornsteen, called on behalf of the proponents, testified:

"The quantities prescribed in these prescriptions are the usual quantities and the intervals suggested for their use are the usual ones. The dosage is average and there is not an overdose in any of these, even if she had taken every dose prescribed. So that if these drugs had been taken as ordered they could not have stupefied the patient but they could have made her drowsy."

Furthermore, Miss Petry, the decedent's nurse, testified that Mrs. Rash refused to take any medicines. She was asked:

"Q. Do you know anything about whether she was taking drugs during the few days before the will was made? A. No, I don't believe she would take any drugs because she refused to take them down at Atlantic City. Doctor Edeiken told me to take them with us. Q. You took them along? A. Yes, and she would not take them. We kept them down there, but she would not take them. Q. Did you see her under the influence of opiates at any time during this period in Atlantic City in the latter part of April? A. No. Q. You were in the house all the time? A. Yes. Q. When was it the hypodermics were first started with her? A. Do you want the exact date? Q. As near as you can give it. A. I should judge about the middle of May, and that was only for sleeping purposes she would get morphine, quarter of a grain at night, to sleep, that was usually given at 10 or 11 o'clock at night by Doctor Edeiken. Doctor Edeiken came to give the hypodermics; the first time there was a hypodermic given, Doctor Edeiken followed me downstairs while I was preparing it and told me he thought Mrs. Rash had a little bit more confidence in him because he knew her a longer time than she knew me, and he would rather give it than have me give it to her. She also questioned from time to time why he had to come to give her these hypodermics when I could give them to her."

Doctor Edeiken in his testimony throws a further light on the subject, in that it appears that he knew of the will on the day of its execution. He says that Mrs. Rash did not want her son-in-law to have any of her money, the reference being to the husband of the contestant.

Furthermore, Doctor Edeiken did not advise any of the family of Mrs. Rash's mental condition until after her death. He did, however, definitely say to Joseph Rash that his mother was not insane.

In the course of Doctor Edeiken's examination, I asked him:

"Q. Doctor, at the time the will was made do you think she knew who her family were? A. Yes, at the time of the will, yes. Q. She knew them individually? A. Yes. Q. You think at that time she knew what property she had and what property she had lost? A. I am not sure that she did. Q. You don't think she knew what property she had? A. I am doubtful whether she did."

It will be noted that the doctor was unwilling to say that she did not know the extent of her property.

Doctor Edeiken was questioned at some length as to the relations between the decedent and her children. His testimony only tended to show that she had an affectionate regard for all. The sum and substance of Doctor Edeiken's testimony was to the effect that the decedent was suffering from cancer which was probably metastatic to the bones of the skull, that he had prescribed sedative drugs, that she knew her family, had suspicions that her physician was deceiving her, that she was not insane, and that he was doubtful as to whether she realized the extent of her property.

The next witness for the appellant was Dr. Joseph C. Yaskin, who had known Mrs. Rash for a number of years. He saw her on February 2, March 2, and June 3 and 9, 1933. His diagnosis of Mrs. Rash was that she had a "tumor within the brain, probably metastatic to the carcinoma removed from the breast. On

March 2d, Mrs. Rash visited Doctor Yaskin at his office when he examined her. He related the record of this visit, as follows:

"She is very circumstantial. She talks at too great a length not only about her illness but about remote past events, about her husband and the children. She complains of business reverses but praises her son Joe and her sons-in-law, their devotion and ability. There is no gross impairment of memory; she is well oriented. She is somewhat depressed and cries very easily. Her mood, however, is easily changed, and she smiles and laughs when reminded that she will soon be a grandmother over again."

Upon cross-examination, Doctor Yaskin admitted that she was having business troubles at that time, and worries with some of the family; and that it was a fact that she was about to have another grandchild. He further said she was depressed, that it was not easy to describe in detail, but it was not a normal depression. He further stated we all were normally depressed in 1932 and 1933.

As bearing on her testamentary capacity, I asked Doctor Yaskin:

"Q. She could recall who her family were? A. In March or in June? Q. When you saw her previous to the will. A. Yes, I think she would know them all absolutely. Q. Do you think she would know if she had any estate? A. I think in March she knew she had an estate."

While Doctor Yaskin gave it as his opinion that Mrs. Rash was suffering from "multiple lesions" or tumors of the brain, he only mentioned one and that was not in the brain. He testified:

"Q. This paralysis you have spoken of, the affection of the vocal cords and the muscles of the neck, would be due to some pressure on what you call the medulla? A. No, if it was she would have been dead a long time ago and could have saved us a lot of trouble. That tumor grew at the base of the brain underneath a bone in the skull through which three nerves passed: one of those nerves supplies the sternomastoid; the other one supplies the vocal cords and the soft palate, and when they are caught together you get just this symptom she had. Q. Those nerves come from the medulla? A. Those nerves come from the medulla. Q. Pressure upon those nerves does not affect the brain process in any way, does it? It affects the muscles? A. The pressure on those nerves will not affect the brain directly; there is no brain tumor without some involvement of the brain as a whole."

Doctor Yaskin's record of his examination of Mrs. Rash on June 3, 1933, 5 weeks after the execution of the will, is illuminating and shows an intelligent comprehension of the examination, of those around her and of her affairs. He said he found her in a much worse condition than on March 2d and his records showed the change:

"The patient was found lying in bed on the right side. She opened her eyes but stated she could not see much and that the light annoyed her. She had an ice bag on her head. She complained of severe pains over the entire head, of inability to see, of vomiting, and of lack of appetite. Her speech was often interrupted by periods of rest. It was noticeable that she often had difficulty in finding words. She recognized the examiner but did not know the day and the date. She showed impairment of memory for both recent and remote events. . . . At times her thoughts lacked sequence. She complained of not receiving sufficient attention from Doctor Edeiken, who did not give her necessary relief. She expressed dissatisfaction with some of her relatives who annoyed her. She stated that she was worried about business. She cried a great deal of the time and appeared definitely depressed."

Could a finding against the will be sustained on this testimony? On March 2d, when he saw her last before the execution of the will on April 28th, she knew the members of her family and was cognizant of her estate. She was weakened physically and mentally but it could not be said she lacked testamentary capacity on April 28, 1933.

The remaining medical witness for the appellant was Dr. Abraham I. Rubenstone, who examined Mrs. Rash on May 11 and 23, 1933, 13 and 25 days after the execution of the will. His testimony is important and I will quote his diagnosis in full.

"Her condition as I found it then was preceded by a progressive downward course, and my examination at that time revealed evidence, outward objectively of cancer and cancerous spread all over the body. I found nodules over the chest and upper abdomen that were shot-like in appearance and there were other nodules elsewhere in the body. She, no doubt, on past history as told me by Doctor Edeiken, had that breast removed 7 or 8 years ago, with a recurrence and a metastasis or spreading of the same type of cell tumor not only all over the body but also probably intracranial. There was also direct evidence in the history as related by Doctor Edeiken to me that evening before I examined her that she had involvement of the bones of her pelvis and her symptoms related to me were as follows: First, when I questioned her before I began my examination, I found she complained of not being able to turn on the left side without immediately vomiting suddenly without any monitory symptoms at all. I said, 'Mrs. Rash, you may lie on the side most comfortable for yourself.' She said, 'Doctor, I have a terrible headache and I have had it for a long while and Doctor Edeiken does not seem to be able to relieve it.' She complained of that pain, 'and I cannot turn around and I cannot eat anything because when I turn around I immediately vomit.' On examination and on questioning her she told me her vision was bad: 'Can you see, Mrs. Rash?' She said, 'No, I can't see very well.' I asked her whether she could see my fingers at that time and she said she could make out fingers but she was not clear as to how many fingers I pointed at her that evening. She also appeared very anemic, she was also blanched, and her blood count must have been very low; she had some rigidity of the neck at that time, which is not normal, and she had increased reflexes and a tendency to spasm when her muscles or joints were tapped. Her heart sounds were of poor quality, and I recall at that time I found evidence of a slight amount of fluid at both lung bases. The tongue had deviated slightly to the left—she had a deviation of the tongue, and when I asked her to pucker her lips she could not do it without a twisting of the mouth to the side. There was weakness in both extremities, upper extremities, in grasping my hand, but I do not recall which of the two was weaker than the other. At this moment without any notes, I am speaking from memory, I cannot tell which was the weaker of the two. During the course of my examination or conversation her whole personality led me to believe that there was a distinct disassociation of the various functions that coöperate one with another to make a normal state of mind and body. In other words, I felt, as I told Doctor Edeiken in the presence, I think, of the son, and maybe of the daughters—there were some women around—she was suffering from the effect of long-continued process of a cancerous growth, not only by virtue of mechanical effects of the growth involving itself but the poison elaborated by the growth and the effect on the individual systems themselves. In other words, she had not only anemia of the brain due to poor circulation but increased pressure in the brain probably due to the tumor formation. It might not have been in the brain itself but in the bone and therefore could last for a long while."

The last two lines of this testimony are of much moment—the tumor might not have been in the brain itself but in the bone.

He was then asked, subject to objection and exception:

"Q. On April 28th, was she of sound disposing mind and memory and could come to a conclusion for disposing of her worldly effects? A. She could be of memory but not of mind."

The symptoms quoted above from the doctor's testimony would not warrant a verdict being sustained against this will. The presumption is capacity, and this testimony is not sufficient to overcome it.

Tobe T. Cioffoletti, an insurance agent, was also called by the appellant. His testimony was largely negative. He said her mental condition was about the same "toward the end as it was years ago"; and that at one time the decedent told him she intended to leave one half of her estate to her son and the other half to her two daughters.

The appellant's own testimony threw no light upon decedent's mental or physical condition.

It should be pointed out that the appellant's case rests upon the testimony of three doctors who attempt to draw an inference of incapacity while admitting the decedent took care of herself, attended to her business, and failed to show any act out of the ordinary.

Mr. Justice Mitchell, in criticizing such testimony in Central Guarantee Trust & Safe Deposit Co. v. White, 206 Pa. 611, 615, said:

"The foregoing is a full summary of the medical testimony on the subject of mental incapacity. It is weak of its kind, and its kind is the very lowest that is ever allowed in a court of justice. Standing by itself the admission that during all the period in question the alleged incompetent took care of himself, went about town attending to all his ordinary business, and the entire failure to show a single unbusinesslike act on his part would so far neutralize the theoretical opinions of the physicians as to his mental capacity, that if the judge had ruled it insufficient to go to the jury we could not have said he was in error."

It should also be recalled that it takes "less capacity to make a valid will, 'than is sufficient, in most cases, to transact ordinary business'": Thompson v. Kyner, 65 Pa. 368, 382; Guarantee Trust & Safe Deposit Co., Exec., v. Waller, 240 Pa. 575.

This decedent knew the members of her family, knew she had an estate and that it was greatly depleted, and there is no evidence to show that she did not understand the disposition she desired to make. Snyder's Estate, 279 Pa. 63, is very much in point.

In Phillips' Estate, 299 Pa. 415, 421, Mr. Justice Simpson said:

". . . appellants' counsel planted their claim for a reversal almost entirely upon the testimony of three doctors, who, on occasions running through a period of thirty or forty years, had been decedent's attending physicians.

"With one accord, they said decedent was not, in their opinion, competent to make a will, yet not one of them gave a legal reason for that conclusion. They gave no instance of a lack of business ability, which seemed to them, apparently, to be a matter of very little moment. Indeed, it would appear from a reading of their testimony, that because they thought decedent had paresis she must be incompetent, since, in their opinion, that was the medical conclusion regarding the disease, at least in its latest stage, and this though they admitted that people had carried on extensive businesses while so suffering."

The testimony of the three doctors, insofar as it depicted the rational every-day life of the decedent, tended to show capacity rather than incapacity, and

their conclusions as to want of capacity are entitled to no weight at all because not founded on adequate facts leading to that conclusion.

An issue must be refused when the appellant's evidence standing alone would not support a verdict against the will: Leisey's Estate, 280 Pa. 533.

Assuming for the sake of argument that I am in error as to the foregoing conclusion, then I must examine the proponent's testimony and ascertain if in view of the whole record the chancellor's conscience could sustain a verdict against the will, and if not an issue should be refused.

The rule is well stated by Mr. Justice Kephart in Lawrence's Estate, 286 Pa. 58, 64:

"The burden was then shifted to contestants to prove the charges on which the will was assailed. Testamentary incapacity must be established by the manifest weight of the evidence. Generally speaking, a like rule exists, when it is claimed that testator's capacity to make a will was so operated on by a moral coercion, as to prevent an unrestrained exercise of faculties, or, in other words, by undue influence. A mere balancing of proofs will not suffice. Where it is not questioned that a will was duly executed, before the judicial mind may condemn a person's solemn declaration, disposing of his worldly effects after death, or order it to run the gauntlet of legal inquisition, for it and its maker there to suffer from unrestrained charges and insinuations by disappointed persons (when the giver is beyond the reach of inquisitorial process), as a court it must be satisfied that it would, on due consideration of the evidence as a whole, in a light most favorable to validity, reasonably reach the conclusion that the giver lacked the full and intelligent knowledge and understanding necessary to dispose properly of his wordly effects; or that the will did not express his real wishes because it was procured through influences so exerted as to destroy free agency at the time the will was made: Tetlow's Est., supra, 496 [269 Pa. 486, 496]. Where all the evidence fails to show by its manifest weight that the testator lacked capacity or was unduly influenced, the court should order the will probated."

The proponent called 10 witnesses who testified to the everyday life and doings of the decedent. It will not be necessary for me to quote from their testimony so fully as I have in the case of the witnesses for the appellant. I will briefly outline who they were and the character of their testimony.

Bernard A. Illoway, of this bar, was the scrivener, and he had represented Mrs. Rash personally for over 2 years and had drafted four wills for the decedent. He received the instructions for the instant will from the decedent personally and was well qualified to judge of her mental condition from an intimacy running over some years.

Anna Petry had nursed the decedent's daughter, Mrs. Fineberg, and lived in the Rash household from April 20, 1933. She it was who accompanied the decedent to Atlantic City over the week-end of April 30th, 2 days after the execution of the will. She had discussed the will with Mrs. Rash before its execution, had nursed her from May 4th, the time when she was obliged to stay in bed, and was well qualified to observe the mentality and physical condition of the decedent.

Mary E. Sulliven was a buyer at Gimbel Brothers, had known the decedent for 19 months previous to her death, and saw her frequently during her last days.

C. J. Warner, an insurance broker, had visited the decedent at her factory in April 1933.

William J. Dolan was the stationary engineer at the decedent's factory and had seen Mrs. Rash the latter part of April 1933.

Dorothy Rash Fineberg was the decedent's daughter, a legatee under this last will, whose interest is identical with that of the appellant. She lived in the decedent's house and saw her every day.

Max Fineberg, husband of the last-named witness, also lived in the house with the decedent, was employed in her business, and saw her every morning and evening.

Reuben C. Boret was the decedent's bookkeeper, a witness to the will, was in daily contact with her, and visited her frequently during her last illness.

Anna F. Vasey, Mr. Illoway's secretary, a witness to the will, had known the decedent for 12 years.

Joseph Rash, son of the decedent, who was given the greater part of the estate in trust, lived with his mother until her death and was active in her business.

And in addition to these, Doctor Ornsteen, assistant professor of neurology at the University of Pennsylvania, was called as an expert, and his testimony I have reviewed above.

The testimony of these witnesses was overwhelming in favor of testamentary capacity.

It is also established that testatrix's intention was to benefit principally her son Joseph H. Rash.

Mr. Illoway testified that he had drafted four wills for the decedent. The first was in July 1931, when the decedent's estate amounted to about $90,000. By it she left $10,000 in trust for each daughter for life, then to their issue or failing issue to the residuary estate; a necklace to her granddaughter, Mrs. Noble's daughter; her house at 5636 Woodbine Avenue to her daughter, Mrs. Fineberg; and the balance in trust for the son, Joseph H. Rash, who was to receive the income until he was 30, when one half of the corpus was to be paid to him; and the balance of the corpus was to be paid to him at the age of 35. If he died before reaching those ages and left no children, the trust was to continue for the lives of the daughters.

Mr. Illoway told her she was leaving three quarters of her estate to her son, and she gave as her reason for doing so that her daughters were married to husbands who were well connected and had relatives with business interests, and they could always get a job or an interest in such business; that her son Joe was entirely alone in the world, with no one he could turn to. She said her relatives in Chicago were poor and her sister in Philadelphia was not well off. She wanted Joe to be independent; he could get a job, and when 30 one half of the principal would enable him to go into business for himself.

After making this will, decedent organized a business—Nobility Frocks, Inc., putting in $20,000 as capital and loaning the company a further sum of $20,000, reducing her estate, outside of this business, to about $40,000. In June 1932, she was apprehensive about the business and feared her money invested in it might be lost. She asked Mr. Illoway to draw another will and cut down the bequests to the daughters so as to protect Joe's share. This cut the daughters down to $5,000 each, gave $5,000 in trust for Mrs. Noble's daughter, and the balance in trust for Joe. She directed that the bequest to Mrs. Noble was to be canceled if she succeeded in a suit she had brought against her mother.

A third will was drawn after the suit against the mother was discontinued. It eliminated the condition attached to the bequest to Mrs. Noble and rescinded the provision in favor of Mrs. Noble's daughter, thereby increasing the interest of Joe.

The business was in bad shape in February 1933; she regarded her money in

it as lost, and decided to make a new will cutting down her daughters to $1,000 each, so as to increase the trust for Joe.

These earlier wills throw a flood of light upon the main testamentary intent of the testatrix, an intent formed at a time when her capacity is admitted, and one which she has reiterated in three earlier wills.

In Long's Estate, 237 Pa. 149, our Supreme Court said: "This will differed but slightly from three prior wills made by the testator at times when there could be no question as to his testamentary capacity, and it expressed the testator's deliberately formed, long continued and oft expressed purpose in disposing of his estate."

See also Lawrence's Estate, 286 Pa. 50, Walton's Estate, 194 Pa. 528, and Peterson's Estate, 18 D. & C. 429.

Several other witnesses testified that the decedent had told them she intended in her will to prefer her son Joe. Among these are Miss Petry and Mrs. Sullivan.

The instant will is the natural sequence of the testatrix's main testamentary intent, as shown by the earlier wills and by the testimony of the witnesses to whom she had confided her wishes.

It is conceded that this decedent was suffering from cancer. One of her breasts had been removed some years previous to her death. It continued to spread—a metastasis of this disease—and Doctor Ornsteen for the proponent says it affected the bones of the skull in April 1933, and the brain in May 1933. He gives his reasons for these conclusions.

He was asked:

"Q. Can you tell us from the testimony which you have heard in respect to this woman whether, based on that testimony, she was in your judgment suffering from cancer of the brain, . . . A. That testimony referring to her last confinement to bed and the symptoms, the signs described just before her death, were in keeping with the diagnosis of cancer of the brain. That was in June. The description of her symptoms at the time she was examined by Doctor Yaskin in March were not symptoms of cancer of the brain, but in the light of the factor she had an operation on her skull bones several years ago the possibility of cancer of the skull bones is present, and I do not dispute the diagnosis of cancer of the cranial bones. That was the reason for Doctor Frazier removing a piece of bone for a microscopic examination. . . .

"The involvement of the brain substance itself by cancer is usually acute. The symptoms are precipitant and the patient is forced to bed by the seriousness of the symptoms. The course is rapid; the patient goes into a very rapid physical and mental decline and into coma for a brief period before death.

"Q. From the description of this patient by the physicians, did those symptoms appear? A. Those symptoms apparently appeared some time in May, requiring her to be put to bed and from that time never leaving her bed. . . . She did not have direct involvement of the brain until she had to go to bed with her serious symptoms. She had cancer of the cranial bones, from the description Doctor Yaskin gave of paralysis of the soft palate, of her neck muscles and vocal cords and in his own words caused by an involvement of the nerves passing through an opening in the base of the skull, that indicates a disease in the bones at the base of the skull, injuring those nerves coming from the base of the brain, and that does not mean brain tumor or brain involvement; it does mean cranial bone cancer."

Doctor Rubenstone, for the appellant, did not dispute these diagnostic reasons, and admitted the "cancer might not have been in the brain itself but in the bone", when the will was executed.

While Doctor Yaskin said there was evidence of cancer of the brain in Feb-

ruary 1933, he was not asked to deny Doctor Ornsteen's diagnostic reasons for concluding that the brain substance was not affected till May 1933; and the same can be said of the testimony of Doctor Edeiken.

Mrs. Rash was described as a woman of great physical and mental energy; of a dynamic personality, forceful, fearless and dominating. Her photograph, taken in January 1933, will be found in the record. Her activities through April were maintained, although somewhat abated; a huskiness in her voice was then noted. She visited her own office through April, went for X-ray treatments up to May, visited her daughter in the Mt. Sinai Hospital between April 7th and 20th, was in Mr. Illoway's office for conference with reference to the instant will, visited Atlantic City on April 30th, and had a chair ride down there on May 2d.

Doctor Edeiken said she could not see. He must be mistaken, because on May 4th she recognized Mrs. Fineberg's dog across the street from her home; in the latter part of April she recognized Dolan across the street and beckoned him to come over; she read the newspapers until confined to bed; she knit a sweater; read the stock market quotations and discussed the market for United Gas Improvement Company; picked out patterns from the Bulletin and described the lines of the dresses; signed checks up to May 29th; and on that day signed a note for $13,500 to the order of The Pennsylvania Company.

These signatures do not suggest physical or mental weakness, and hence tend to disprove these contentions: Keen's Estate, 299 Pa. 430.

Mr. Illoway and the witnesses, Miss Vasey and Mr. Boreth, all testified that Mrs. Rash put on her glasses and after reading the will said "that is just what I want", and it was then executed. She was fully dressed and seated in a chair on the arrival of Mr. Illoway and Miss Vasey, and she accompanied Mr. Illoway downstairs after the will was executed. Furthermore, the witnesses have similar recollections of the details of execution.

Practically all the evidence relating to Mrs. Rash's mental condition was to the effect that her mind was functioning as well as it ever did on April 28, 1933, the day the will was executed.

Mr. Illoway says her clarity was just the same on April 24th and 28th as it always was; in fact, he saw no signs of diminution thereof at the time of his last visit, toward the end of May.

Mrs. Sullivan saw no change in her mental condition between August 1932 and April 23, 1933, nor did any change manifest itself by the end of May.

Mr. Werner could discern no lessening of the decedent's activity or keenness of mind in the middle of April 1933.

Mrs. Fineberg, the decedent's daughter, first noticed declining mental capacity 2 days before the decedent's death.

Max Fineberg, her son-in-law, could see no appreciable difference mentally in April 1933; nor could Boreth.

Miss Vasey testified that her conversation was as alert in April as it had been before.

Miss Petry, the nurse, said she talked like a reasonable person on her visit to Atlantic City on April 30th, and that the first time she talked irrationally was on the Friday before she died.

Joseph Rash never noticed any change in his mother's mental capacity.

Decedent's ability to recognize her family is conceded, several of the appellant's witnesses so testified, and she knew persons outside of the family.

Miss Petry tells of an incident that happened in Atlantic City when Mrs. Rash recognized a maid who had been in the hotel where she had stayed 2 years previously. It will also be recalled that she recognized Dolan from a distance.

Decedent's knowledge of her estate is best illustrated by the active interest she took in her financial relation to the business—Nobility Frocks, Inc. She knew that she had put too much money in and was striving to protect it. She knew the amount of bonds she had hypothecated with The Pennsylvania Company for a collateral loan, and she signed a note in favor of The Pennsylvania Company nearly a month after the will was made. She knew she owned her home, and that she had a necklace far too valuable for one in her reduced station of life.

Throughout March and April and into May, she took an active part in the business, visited the factory, passed upon the designs of the dresses, interviewed salesmen, and helped with the buying. When she was unable to go to the factory, she would call on the telephone every morning to find out what was in the mail, what checks came, what business came in, what the salesmen from the middle west had reported and likewise those from the south, even mentioning the names of the salesmen.

In the evening, at home with Joseph Rash and Max Fineberg, who were employed by the company, she would inquire as to what had happened during the day.

Boreth's testimony with regard to her business activity is illuminating, and I will quote it:

"She took entire charge of the business; in other words, she bought the patterns and passed on all designs and models in which the dresses would be made up; gave instructions to the foreman of the shop and complained of any imperfections in the dresses, took up with the head cutter the amount of dresses and the cut of each pattern, and also conferred with me upon the necessity of finances and anticipated the various needs of money and arranged for furnishing them whenever necessary."

A striking example of Mrs. Rash's thorough mastery of herself and business is an incident related by Max Fineberg, which occurred a day or two before his wife's return from the hospital on April 20th. He said:

". . . she said to me, 'Max, I think as soon as the lease is up,' which I think was around July or August, somewhere around there, 'we take half of the floor and bring down the expenses.' At that time we were paying a rental of around $3,200 and she said, 'We can take half of the floor and bring down the expenses; also, in the New York office instead of having the whole office we can rent out part of the office and if we cut down we would not have to worry about doing 300 or 350 thousand dollars' worth of business we can do a $150,000 and make a nice living and we would not have to worry about big business, for we could make a nice living. . . . 'Max, get a paper and pencil.' I did not know what it was all about. . . . I got this paper and pencil and she walked into her room and at the dresser—sort of dresser—I stood there with paper and pencil and she said, 'Now, Max, if we can get a rental of about $125 a month'—'put that down. If we can't rent out the office—I mean if we can't get the lessee out from the New York office we can get someone else in there.' They already had one tenant in there. 'We could get somebody else in there and bring our rental down to practically 30 or 50 dollars.' I remember she mentioned that and she had me figure these things out and she said, 'Our overhead we can figure on 15 percent and figure a profit of 10 or 15 percent.' These different figures she was giving me there and we talked it over for quite a while, for a half hour or three quarters of an hour."

I have heretofore stated that in my opinion the evidence adduced by the appellant was not, standing alone, sufficient to support a verdict against the will; and now, having reviewed that offered by the proponent, I am of opinion that

if ·a verdict were rendered against the will a chancellor would be constrained to set it aside.

In this connection, see Snyder's Estate, 279 Pa. 63, 66, where Mr. Justice Simpson states the rule as follows:

"At the outset we are again faced with the perennial contention that because the imperative 'shall,' appears in section 21 (b) of the Act of June 7, 1917, P. L. 363, 382, an issue must be awarded, if there is any evidence upon which a jury, sitting as at common law, could find a verdict against the will. A jury is not, however, the only arbiter of the facts in this class of cases, and for nearly a century we have consistently so held. It suffices to refer to Phillips' Est., 244 Pa. 35; Tetlow's Est., 269 Pa. 486, and Doster's Est., 271 Pa. 68. While there is ample authority for the proposition that, if contestant's evidence makes out a case for the jury, an issue should be awarded, unless proponent's is so strong as to render it clear that, in conscience, a verdict against the will could not be sustained; yet it is the chancellor's conscience, and not a jury's which is to be satisfied in the first instance. When his enlightened conscience stands in the way of an issue, it should never be awarded."

The appeal is dismissed, the action of the register of wills admitting the will to probate is affirmed, and the record is remitted to him.

*Harry Shapiro*, for exceptant.

*Harry Fischer, John F. Headly*, and *Robert T. McCracken*, contra.

SINKLER, J., January 19, 1934.—Careful consideration of the record and of the exceptant's argument, both oral and written, leads to the conclusion that the findings of the hearing judge are correct, to wit, that the decedent had, when the will was executed, testamentary capacity; and that if a jury had rendered a verdict otherwise it should be set aside.

The exceptions are dismissed, and the decree of the hearing judge dismissing the appeal and remitting the record to the register of wills is confirmed absolutely.